**SEND**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| SPALDING LABORATORIES, INC., a California Corporation,, | ) ) ) | CV 06 - 1157 ODW (SHx) |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW |
| ARIZONA BIOLOGICAL CONTROL, INC., d/b/a ARBICO ORGANICS, an Arizona Corporation, and DOES 1 through 50, inclusive, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

_____

I.    <u>INTRODUCTION</u>

At the close of Spalding Laboratories, Inc.'s ("Plaintiff" or "Spalding") case-in-chief at trial, Defendant Arizona Biological Control, Inc., d/b/a ARBICO Organics ("Defendant" or "ARBICO") moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) and 52(c).  Pursuant to the Court's briefing schedule, Defendant filed its Motion on November 13, 2007, Plaintiff filed its Opposition on November 15, 2007, and oral argument was heard the following day on November 16, 2007.   Having read and considered the papers submitted, having reviewed the transcript of the proceedings, and having heard argument on this matter, the Court DENIES Defendant's Motion *without prejudice* to it being renewed after Plaintiff has been afforded an opportunity to correct the evidentiary deficiencies identified in this Order.

1

II.     LEGAL STANDARD

2

Federal Rule of Civil Procedure 50(a)(1) provides:

3

> If a party has been fully heard on an issue during a jury trial and
> the court finds that a reasonable jury would not have a legally

4

> sufficient evidentiary basis to find for the party on that issue, the
> court may resolve the issue against the party and may grant a

5

> motion for judgment as a matter of law against the party on a
> claim . . . that, under the controlling law, can be maintained or

6

> defeated only with a favorable finding on that issue.

7

A motion for summary judgment raises the same issue as a motion for judgment as

8

a matter of law at trial under Rule 50(a). "The primary difference between the two motions

9

is procedural; summary judgment motions are usually made before trial and decided on

10

documentary evidence, while [motions for judgment as a matter of law] are made at trial

11

and *decided on the evidence that has been admitted*." *Anderson v. Liberty Lobby, Inc.*, 477

12

U.S. 242, 250 (1986) (emphasis added). "In essence though, the inquiry under each is the

13

same: whether the evidence presents a sufficient disagreement to require submission to a

14

jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* In

15

other words, "if, under the governing law, there can be but one reasonable conclusion as

16

to the verdict" the trial judge must grant the motion. *Id.* at 250-51. "If reasonable minds

17

could differ as to the impact of the evidence, however, a [motion] should not be [granted]."

18

*Id.*

19

In ruling on the motion, the Court does not weigh the evidence, and all factual

20

inferences must be drawn in favor of the non-moving party. *Lytle v. Household Mfg., Inc.*,

21

494 U.S. 545, 549 (1990). The Court "must disregard all evidence favorable to the moving

22

party that the jury is not required to believe." *Reeves v. Sanderson plumbing Prods., Inc.*,

23

530 U.S. 133, 151 (2000). However, the Court is under a duty to grant a motion for

24

judgment as a matter of law where the facts and inferences from the evidence point so

25

strongly and overwhelmingly in favor of the moving party that it concludes there is but one

26

reasonable conclusion as to the proper judgment. *See Anderson*, 477 U.S. at 251.

27

28

2

Finally, "[w]here a non-moving party has failed to present sufficient evidence to withstand judgment as a matter of law under Rule 50, the Court may not enter judgment in favor of the moving party without first apprising the non-moving party of the material deficiencies in the evidence and affording it an opportunity to present additional evidence on dispositive facts to correct those deficiencies." *Conley v. R.J. Reynolds Tobacco Co.*, 286 F.Supp.2d 1097, 1102 (N.D. Cal. 2002) (citing *Waters v. Young*, 100 F.3d 1437, 1441-42 (9th Cir. 1996)). This condition applies regardless of whether the non-moving party is represented by counsel. *Waters*, 100 F.3d at 1442.

III.   DISCUSSION

In reviewing Defendant's Motion, several of the arguments contained therein, if accepted, would be dispositive of Plaintiff's claims. *See e.g. Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d, 489, 495 (5th Cir. 2000) (noting that the failure to establish any element of a prima facie case under the Lanham Act is fatal). Normally, then, the Court would not rule upon non-dispositive arguments. However, because the Court is obligated to provide Plaintiff an opportunity to correct all of its evidentiary deficiencies, the Court addresses all of Defendant's arguments in order that Plaintiff properly understand the consequences of failing to correct these deficiencies.

   A.   Plaintiff's Lanham Act Claim

Under § 43(a) of the Lanham Act, an actionable claim for false advertising includes the following elements: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) evidence that the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception must be material (i.e., likely to influence the purchasing decision); (4) evidence the defendant caused the statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by loss of sales or

1  lessening of goodwill associated with its products.  *Southland Sod Farms v. Stover Seed*

2  *Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *accord Cook, Perkiss and Liehe, Inc. v. N. Cal.*

3  *Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990); *Mut. Pharm. Co. v. Ivax Pharm.,*

4  *Inc.*, 459 F.Supp.2d 925, 932 (C.D. Cal. 2006).

5                        (i)    False Statement

6          The falsity of the statement can be established "either by showing that, in context,

7  the statement 'was literally false, either on its face or by necessary implication,' or by

8  showing that although the statement was 'literally true' it was nonetheless 'likely to

9  mislead or confuse consumers' as evidenced by consumer surveys."  *Mut. Pharm. Co.*, 459

10  F.Supp.2d at 932 (citing *Southland*, 108 F.3d at 1139); *Santana Prods., Inc. v. Bobrick*

11  *Washroom Equip., Inc.*, 401 F.3d 123, 136 (3d Cir. 2005) ("The plaintiff must prove that

12  the commercial message is either literally false or, if not literally false, literally true or

13  ambiguous with the tendency to deceive customers.").  These two different forms of

14  falsehoods subject to an action under the Lanham Act have correspondingly different

15  evidentiary requirements: "Where the advertisement is literally false, a violation may be

16  established without evidence of consumer deception."  *Scotts Co. v. United Indus. Corp.*,

17  315 F.3d 264, 273 (4th Cir. 2002).  If, however, "a plaintiff's theory of recovery is

18  premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic

19  evidence, that the challenged [advertisements] tend to mislead or confuse consumers."  *Id.*

20  at 273 (quoting *Johnson & Johnson * Merk Consumer Pharm. Co. v. Smithkline Beecham*

21  *Corp.*, 960 F.2d 294, 297 (2d Cir. 1992); *accord Abbott Labs v. Mead Johnson & Co.*, 971

22  F.2d 6, 14 (7th Cir. 1992) ("[A] court may find on its own that a statement is literally false,

23  but, absent a literal falsehood, may find that a statement is impliedly misleading only if

24  presented with evidence of actual consumer deception.").  Because Plaintiff does not

25  appear to proceed under only one theory of falsity, the Court discusses each  in turn.

26  ///

27

28                                              4

1

(a)    Literal Falsity

2    "In analyzing whether an advertisement . . . is literally false, a court must determine,

3    first, the unambiguous claims made by the advertisement . . ., and second, whether those

4    claims are false." *Novartis Consumer Health, Inc. v. Johnson & Johnson - Merck*

5    *Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (noting that ambiguous

6    statements cannot be literally false). "A literally false message may be either explicit or

7    conveyed by necessary implication when, considering the advertisement in its entirety, the

8    audience would recognize the claim as readily as if it had been explicitly stated." *Id.* at

9    586-87.   Proof of literal falsity, however, will depend upon whether the challenged

10    statement does or does not make reference to validating tests. *See BASE Corp. v. Old*

11    *World Trading Co., Inc.,* 41 F.3d 1081, 1091 (7th Cir. 1994). Thus, the falsity of a "tests

12    show" claim may be proven by "showing that the tests . . . were not sufficiently reliable to

13    permit one to conclude with reasonable certainty that they established the proposition;"

14    whereas the falsity of a "bald" claim may be proven only by evidence affirmatively

15    showing its falsity. *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62-63 (2d Cir. 1992);

16    *Southland*, 108 F.3d at 1139 (citations and quotations omitted).   Because  none of

17    Defendant's allegedly false statements are "tests show" statements, Plaintiff has the burden

18    of affirmatively showing falsity.

19    As noted in the Court's briefing instructions, there appears to be little dispute over

20    whether any of Defendant's statements are literally false.[1]  For that reason, the Court

21    _____

22    [1] The Court addresses here Plaintiff's position that literal falsity has been proven and remains an
issue  required to go to the jury. (Opp'n at 6, n.9.) The Court's finding that there is little dispute relating

23    to literal falsity is supported by the proposition that only "admitted" evidence may be considered in ruling
on a Rule 50 motion. Because of this restriction, the Court addresses here Plaintiff's failure to move all

24    but two exhibits into evidence. At trial, Plaintiff introduced, but did not move to admit, approximately
thirty (30) exhibits from the parties' joint exhibit list. Whether Plaintiff simply "forgot" to admit these

25    exhibits the Court expresses no opinion. What is clear, however, is that Plaintiff's failure to do so
severely limits its ability to prove its case. With that in mind, the Court deemed admitted those exhibits

26    which were stipulated to, without objection, in the parties' joint exhibit list. Accordingly, for purposes

27

28                                                    5

instructed the parties to focus most of their efforts upon the proof, or lack thereof, of deception. However, in an effort to provide as much due process to Plaintiff as possible, the Court will assume that none of the statements discussed within this section are ambiguous and therefore examines each under a theory of literal falsity before proceeding to any evidentiary deficiencies relating to consumer deception.

1.  "Largest Parasite Producer in the World!; "World's leading producer"; "WORLD'S #1 Fly Control."

Plaintiff claims that Defendant's assertions of being the "largest," "leading," and "world's #1" producer are false and/or misleading.[2]  Plaintiff, however, has failed to produce any evidence which would prove that these statements are literally false. In other words, Plaintiff has not established that any other "competitor" of ARBICO is, in fact, "larger" or that ARBICO is not, in fact, the "World's #1."  To be sure, the jury heard testimony from Ms. Sinthia Penn that she "believe[d] that [her] production is a lot larger than ARBICO's production." (Trial Tran. 11/6/07, 97: 3-5.) This, however, is insufficient

of this Motion the following exhibits are deemed admitted into evidence: 2, 4, 26, 56, 65 (last four pages only), 88, 93, 95, 112, 202, 239, and 243. As discussed more fully below, the Court's decision permitting Plaintiff to make a proffer and to possibly re-open its case-in-chief shall not be construed as an opportunity for Plaintiff to move into evidence all exhibits it forgot to do so initially. The Court will entertain only motions, and objections, if any, thereto, to admit into evidence exhibits that bare directly on Plaintiff's curing of the evidentiary deficiencies discussed in this Order. In that regard, Plaintiff's "Renewed Request for Admission of and/or Proffer With Regard to Specified Trial Exhibits" is MOOT.

[2]  The Court is aware of Defendant's affirmative defense that these statements are non-actionable puffery under the Lanham Act. Defendant's contention is not entirely without merit. The District Court may determine, *as a matter of law*, whether alleged claims are statements of fact, actionable under the Lanham Act, or are mere puffery. *See Cook*, 911 F.2d at 245; *Radio Today, Inc. v. Westwood One, Inc.*, 684 F.Supp. 68, 74 (S.D.N.Y. 1988) (considering whether alleged misrepresentations were puffery in determining whether a complaint stated a cause of action for false advertising under the Lanham Act). To be actionable, the statement must be a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). Here, the Court draws all inferences in Plaintiff's favor and finds that these statements are not only unambiguous but are also specific and measurable and are capable of being proven false. Indeed, the Court's decision is guided by the fact that proving literal falsity presents less of a burden upon Plaintiff and by Plaintiff's insistence that these statements be included as issues to be tried in its case-in-chief.

1  to prove that ARBICO's claims of being the "largest" and "leading" producer are literally

2  false.  Ms. Penn's opinion that ARBICO may not be the largest producer is of no import.

3  Plaintiff has the burden of *affirmatively* establishing the falsity of these statements, lest

4  they be considered puffery.  *See e.g. Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d

5  Cir. 1993) (claims not subject to measurement or are vague  are puffery).  Sufficient

6  evidence would therefore include, for example, an actual comparison of the numbers of

7  parasites produced at ARBICO's facilities during the years in question to that of

8  ARBICO's competitors, including, but not limited to, Spalding (or, Spalding's supplier,

9  Beneficial Insectories). Without comparative evidence to this effect, Plaintiff has not and

10  cannot prove that these statements are literally false.

11  2.    "Healthier, more aggressive, more productive parasites."

12  As a preliminary matter, Defendant's statement that its Fly Eliminators are

13  "healthier, more aggressive, and more productive" is not capable of being proven literally

14  false because such descriptions are too arbitrary and ambiguous.  (Trial Tran. 10/31/07,

15  122: 13-25.)  However, the Court need not get that far as this statement–whether it refers

16  to ARBICO's past generation of insects or not–is  non-actionable puffery.  "Puffery exists

17  in two general forms: (1) exaggerated statements of bluster or boast upon which no

18  reasonable consumer would rely; and (2) vague or highly subjective claims of product

19  superiority, including bald assertions of superiority." *Am. Ital. Pasta Co. v. New World*

20  *Pasta Co.*, 371 F.3d 387, 390-91 (8th Cir. 2004).  For example, statements describing one's

21  own goods as the "best," "most advanced" and "new and improved"  have all been held to

22  be puffery. *See e.g. Pizza Hut*, 227 F.3d at 498 ("Better Pizza" held to be non-actionable

23  puffery); *Atari Corp. v. 3DO Co.*, 1994 WL 723601 at *2 (N.D. Cal. 1994) (describing

24  product as "the most advanced" was non-actionable puffery); *Laitram Machinery, Inc. v.*

25  *Carnitech A/S*, 884 F.Supp. 1074, 1083 (E.D. La. 1995) ("new and improved elements" is

26  non-actionable puffery).  Here, "healthier, more aggressive, and more productive" is

27  nothing more than a highly subjective claim of product superiority akin to slogans

28  describing products as "the best" or "new and improved."   Indeed, any argument by

1  Plaintiff to the contrary is belied by Dr. Peterson's testimony that it is impossible to

2  measure, for example,  the health of the nasonia species.  (Trial Tran. 10/31/07, 122: 13-

3  16.); *Castrol, Inc.*, 987 F.2d at 946 (claims not subject to measurement are puffery).

4  3.    "Fly Eliminators lay 7-10 eggs per pupa."

5  Plaintiff has not proven this statement to be literally false.  To the contrary, it's own

6  expert proved that Fly Eliminators can, in fact, lay 7-10 eggs per pupa, if not more.  (Trial

7  Tran. 10/31/07, 93: 7-14; 135: 6-16.)

8  4.    "Lowest Fly Control Cost Guaranteed!"; "2-5 Horses . .

9  . $17.95;" "Compare - we have lower prices and higher

10  parasite quantities."

11  Drawing all inferences in favor of Plaintiff, and assuming the statement "lowest fly

12  control cost guaranteed" is unambiguous, Plaintiff has failed to produce evidence that this

13  statement is literally false.  In other words, Plaintiff has not produced any evidence that

14  ARBICO will not "meet or beat" any advertised price.  Plaintiff could have, for example,

15  produced evidence of specific instances where ARBICO did not "meet or beat" a

16  competitors advertised price.  However, without such evidence Plaintiff has failed to show

17  the falsity of this statement.

18  Similarly, Plaintiff has not produced evidence to show that ARBICO's price of

19  $17.95 per half-unit is not the "lowest cost" or is not a "lower price" than its competitors.

20  Indeed, the jury heard testimony and saw evidence that ARBICO is, in fact, fifty cents

21  cheaper per shipment than Spalding.  Moreover, evidence of what other competitors charge

22  for similar products is missing.  Surely, the most effective way to prove that ARBICO is

23  not literally the "cheapest" would be to produce evidence of other competitors' lower

24  prices.  Plaintiff did not do so.

25  Further, to the extent the jury adopts Plaintiff's theory  that ARBICO is not, in fact,

26  the lowest price "per season," Plaintiff's evidence, again, falls short. As discussed more

27  fully below, Plaintiff failed to even prove that this "per season" interpretation is what a

28  statistically significant percentage of consumers actually understood ARBICO's ads to

8

mean.  However, even assuming the statement implies  a "per season" cost rather than a "per shipment cost," the only evidence Plaintiff produced to prove the falsity of such a claim came in the form Tom Spalding's *belief* that ARBICO is not cheaper per season. (*See* Trial Tran. 10/30/07, 58: 3-7) ("And based on the data that they have in their catalogues, they'd tell people they need more shipments than we *believe* are necessary. And so even with the lower cost per shipment, if you have to take two or more shipments, that tends to make way more cost per season.").  Without actual evidence of how many shipments are, in fact, necessary, or actual evidence of how much ARBICO's customers spend per season on fly control as compared to its competitors' customers, Mr. Spalding's beliefs are insufficient.

5.    <u>"Same Insects as Our Competitors - Except 10X More!;"</u>
<u>"10X More Bugs!;" "50,000 Parasites."</u>

With respect to "same insects as our competitors," Spalding failed to prove that this statement is false because  when compared to Spalding's insects, ARBICO *does* sell at least some of the same insects.  To begin, it is undisputed that Spalding receives its insects from Beneficial Insectories.  Beneficial Insectories, it was shown, produces a mix of three types of fly parasite species: spalangia, muscidefurax zaraptor, and muscidefurax raptorellus. The jury then  heard testimony from Mr. Frey that during the relevant time period, ARBICO's product contained approximately ninety percent nasonia and a ten percent mix of the same three species produced by Beneficial Insectories.  (Trial Tran. 11/6/07, 155: 9 - 157: 11.)  In fact, ARBICO purchased this ten percent from Beneficial Insectories. (Trial Tran. 11/6/07 155: 9-13.)  The mere fact that ARBICO's product contained only ten percent of the "same insects" as Spalding is irrelevant.  And, to the extent Plaintiff asserts ARBICO's insects are not the same as competitors other than Spalding, no evidence disproving such assertions was produced.

Turning now to ARBICO's quantitative claims, not surprisingly, the Court spends little time discussing whether these statements are literally false.  Plaintiff's case-in-chief is completely devoid of any affirmative evidence proving these statements are false.  To

9

1   the best of the Court's knowledge, no reliable tests have been performed to disprove these

2   statements and no expert has testified that these claims are untrue.  The closest Plaintiff

3   comes to proving the falsity of ARBICO's "10X More" and "50,000 parasites" is Dr.

4   Peterson's opinion that it would be nearly impossible for 5,000 pupa comprised of *entirely*

5   nasonia to result in 50,000 emerged parasites. (Trial Tran. 10/31/07, 121: 1-15).  However,

6   two problems with this opinion are apparent.  First, Spalding provides no admissible

7   evidence that ARBICO's ads refer to the number of "emerged" insects a consumer can

8   expect.[3]  Indeed, as discussed below, no survey or market research was conducted by

9   Plaintiff to substantiate such an interpretation, if any.  Second, even if ARBICO's ads did

10  refer to the number of "emerged" parasites, ARBICO's product is not comprised *entirely*

11  of nasonia.  Moreover, Dr. Petersen did no tests on ARBICO's product and was entirely

12  unfamiliar with the 10% mix ARBICO used.[4]

13      Finally, as a general proposition, the Court comments upon Plaintiff's numerous

14  attempts to establish Defendant's lack of "due diligence" in verifying the accuracy of its

15  advertisements.  In cases such as this, where the allegedly false advertisements are not

16  "tests show" statements, any lack of "due diligence" on Defendant's behalf is of no

17  consequence.  "The plain language of Section 43(a), which prohibits false rather than

---

[3]   To the extent an email chain between Jennifer Bauman, an ARBICO employee, and an ARBICO customer establish otherwise (Opp'n at 7), such email has not been admitted into evidence. Moreover, the operative inquiry is not what an ARBICO employee interprets its ads to mean.  To the contrary, the Lanham Act requires that Plaintiff demonstrate what *consumers* perceive the ad to mean. *See Smithkline Beecham Corp.*, 960 F.2d at 297-98 (noting that the relevant inquiry is what the consuming public perceives the message to be).

[4]   The Court notes that given the differing interpretation between the parties, the term "parasite" is arguably ambiguous and therefore not capable of being proven literally false. However, the phrases "10X More" and "50,000 parasites," when juxtaposed with a picture of an emerging fly parasite and a caption stating "ready to go to work for you," would suggest that ARBICO is promising 50,000 emerged parasites. (Opp'n at 6-7.) In that regard, the Court will draw all inferences in favor of Plaintiff and find that the statements "10X more bugs" and "50,000 parasites" are unambiguous. Drawing this inference, however, does not change the Court's overall conclusion. The fact remains that these unambiguous statements are more than capable of being measured or proven and Plaintiff has simply not conducted any scientifically reliable tests to disprove these claims. Accordingly, Plaintiff has not met its burden of establishing literal falsity, implied or otherwise.

1    unsubstantiated representations, requires that a plaintiff establish not merely that the

2    defendant's claims lack substantiation but also that it is false or deceptive." *U-Haul Int'l,*

3    *Inc. v. Jartran, Inc.*, 522 F.Supp. 1238, 1248 (D. Ariz. 1981).  *See also Sandoz Pharm.*

4    *Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228 (3d Cir. 1990) (citations omitted) ("a

5    Lanham Act plaintiff bears the burden of showing that a challenged advertisement is false

6    or misleading, not merely that it is unsubstantiated by acceptable tests or other proof.").

7    Thus, Plaintiff is advised that any proper method of curing the evidentiary deficiencies

8    discussed herein would necessarily require more than establishing that Mr. and Mrs. Frey

9    did not substantiate their claims.

10                      (b)      Consumer Deception

11           As noted above, Plaintiff's failure to prove that Defendant's statements are literally

12   false is not the only factor the Court considers.  "[C]laims that may be literally true or

13   ambiguous but which implicitly convey a false impression, are misleading in context, or

14   are likely to deceive consumers" are still actionable under the Lanham Act.  *See United*

15   *Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998).  In other words,

16   "'plaintiffs alleging an implied falsehood are claiming that a statement, whatever its literal

17   truth, has left an impression on the listener that conflicts with reality' - a claim that 'invites

18   a comparison of the impression, rather than the statement, with the truth.'"  *Time Warner*

19   *Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007) (quoting *Schering Corp.*

20   *v. Pfizer, Inc.*, 189 F.3d 218, 229 (2d Cir. 1999)); *Am. Council of Certified Podiatric*

21   *Physicians and Surgeons v. Am. Bd. of Podiatric Surgery*, 185 F.3d 606, 615 (6th Cir.

22   1999) ("[P]laintiff must demonstrate that the statement actually deceived consumers into

23   believing something untrue. . . .).  A plaintiff attempting to establish this type of falsehood,

24   that an advertisement is literally true or ambiguous but misleading, must "present evidence

25   of deception" in the form of consumer surveys, market research, expert testimony, or other

26   evidence.  *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d

27   1242, 1247 (11th Cir. 2002).  "[T]he success of a plaintiff's implied falsity claim,

28   [however], usually turns on the persuasiveness of a consumer survey."  *Smithkline*

1    *Beecham Corp.*, 960 F.2d at 298.

2        Before the Court discusses this element any further, it must briefly address Plaintiff's

3    reliance on *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir. 1986). (Opp'n at 10-12.)

4    Reliance on analyses of "actual confusion" in cases involving trademark and trade dress

5    infringement are wholly irrelevant to the false advertising claims now before the Court.

6    To begin, in a claim for trademark or trade dress *infringement* under the Lanham Act (of

7    which this case is neither), proof of actual confusion is not necessary; likelihood of

8    confusion is all that need be shown. In infringement cases, evidence of "actual confusion"

9    is but one of several factors to be weighed in order to determine "likelihood of confusion"

10   as to the *origin* of goods or services. Thus, if evidence of actual confusion as to the origin

11   of one's goods–whether it be three instances or three hundred instances–is found, there is

12   a strong presumption that "likelihood" of confusion exists. Not once has it ever been

13   suggested that this same "likelihood of confusion" test is the standard for a false

14   advertising claim under the Lanham Act. To the contrary, courts apply a different, distinct

15   test for claims of false advertising: "a party bears the burden of proving actual deception

16   by a preponderance of the evidence . . . . [I]t cannot obtain relief by arguing how

17   consumers *could react*; it must show how consumers *actually do react*." *See Sandoz*, 902

18   F.2d at 228-29 (emphasis in original). Moreover, actual deception must be shown to exist

19   in a statistically significant portion of the advertisement's intended audience. For these

20   reasons, the Court proceeds under the standards appropriate in a false advertising case.

21                       (1)    Consumer Surveys and Market Research

22       Notably absent from Plaintiff's case-in-chief is any evidence, reference, or proof that

23   the relevant consuming public was deceived by statements made in Defendant's 2005 and

24   2006 advertisements. Not one single consumer survey was admitted into evidence. The

25   closest Plaintiff comes to introducing survey evidence is by way of Mr. Warren and Mr.

26   Couto's testimony relating to 2005 and 2006 customer care inquiries. These inquiries,

27   however, are insufficient to establish deception based on consumer surveys because, for

28   the reasons discussed in ruling upon Defendant's Motions in Limine, the telephone calls

performed by Spalding employees Warren and Couto are not, in fact, "surveys" admissible to prove consumer reaction to particular ARBICO advertisements.

(2)    Expert Testimony

Here, the Court adopts the reasoning espoused in Defendant's moving papers under the section entitled "Spalding Introduced No Expert," (Mot. at 6-7), and concludes that the testimony of Plaintiff's expert, Jack Schmid, is legally insufficient to support a finding of consumer deception.

(3)    "Other Evidence"

Even if described as "canvassing" or "anecdotal," Plaintiff's reliance on transcripts of phone conversations between Spalding employees and Spalding customers and on the 2005 and 2006 customer care inquiries to prove that consumers were "misled" as to what ARBICO's ads meant is drastically inadequate. At trial, Spalding surmised that through these inquiries and through these transcripts, consumers thought they were getting "10X more "emerged" insects" from ARBICO, or that ARBICO promised 50,000 "emerged" insects for $17.95. However, Spalding failed to prove such contentions. With respect to confusion over whether consumers expected to receive 50,000 "emerged" or "un-emerged" insects, Defendant correctly asserts that Spalding produced no evidence "to support a claim that consumers harbored such a belief or, equally important, that if such consumers harbored such a belief, *that competent scientific evidence shows the belief is false*." (Mot. at 7-8) (citations omitted) (emphasis added). In other words, it would be impossible for the jury to determine that ARBICO's ads "left an impression on the listener that conflicts with reality" because Plaintiff did not even produce evidence to show what that "reality" or "truth" is. *See Am. Council of Certified Podiatric Physicians and Surgeons*, 185 F.3d at 615. Thus, without evidence of what is "true" and what is "false," the jury has no context to determine whether Spalding's claimed misleading meaning was the message that was actually conveyed to the complaining consumers. *See William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (requiring proof that the advertising actually convey the implied message). For all intents and purposes, all the jury heard were consumers

13

1    repeating the phrases "10X More" and "50,000 parasites."

2                    (ii)    Plaintiff Failed To Prove A Statistically Significant Portion Of The
3                            Relevant Market Were Deceived

4          No matter how Plaintiff characterizes the evidence it introduced at trial (surveys,
5    opinions, "other evidence, etc.), the fact remains that the Lanham Act requires proof that
6    statements actually deceive, or have the tendency to deceive, a *substantial segment* of its
7    audience. *Southland*, 108 F.3d at 1139; *see also Smithkline Beecham Corp.*, 960 F.2d at
8    298 (requiring a "statistically significant" part of the commercial audience to hold the
9    allegedly false belief). As a preliminary matter, the Court notes that this standard applies
10   to all statements contained in ARBICO's 2005 and 2006 advertisements. However,
11   because Spalding's efforts at trial were confined almost entirely to ARBICO's quantitative
12   claims, the Court will restrict its discussion to those specific statements.

13         Drawing all inferences in favor of Plaintiff, and assuming the jury could find that
14   certain consumers were misled (the ability of it to do so having already been questioned),
15   Plaintiff failed to prove that these consumers constitute a statistically significant portion
16   of the parties' relevant market. At the very best, Plaintiff introduced evidence that 44
17   Spalding customers left Spalding for ARBICO in the years 2005 and 2006. What is
18   missing, however, is the denominator: evidence of the relevant market of consumers. The
19   relevant market is not, as Plaintiff contends, *non-renewing* Spalding customers who *still*
20   need fly control. (*See* Opp'n at 15). Rather, the relevant market is the audience of
21   individuals to whom ARBICO and Spalding target their advertising; i.e. *consumers* who
22   both read the ads and *need* fly control. *See Clorox Co.,* 140 F.3d at 1182-83 (requiring a
23   significant portion of the recipients who observed the advertisements). No evidence was
24   introduced by Plaintiff that these 44 customers are a statistically significant representation
25   of the total number of consumers ARBICO (or Spalding) advertise to; i.e. their "intended
26   audience." Indeed, the jury heard no evidence of what that "total number" might be.

27                    (iii)   Injury

28         In cases alleging a § 43(a) violation, "the preferred approach allows the district court

                                            14

in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances." *Southland*, 108 F.3d at 1146 (citing *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1411 (9th Cir. 1993). Thus, even if a plaintiff is unable to demonstrate damages resulting from the defendant's alleged § 43(a) violation, § 1117 allows the district court to award the plaintiff any just monetary award so long as it constitutes "compensation" for the plaintiff's losses or the defendant's unjust enrichment and is not simply a "penalty" for the defendant's conduct. *See Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994).  And, for claims involving false advertising, "courts have been more willing to allow monetary damages even without a showing of actual consumer confusion." *Southland*, 108 F.3d at 1146 (citation omitted).  "In fact, for false comparative advertising claims, this [Ninth] circuit has held that '[p]ublication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance.'" *Id.* (quoting *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040-41 (9th Cir. 1986).

Plaintiff's failure to produce any evidence of falsity severely limits, if not precludes, the Court's discussion of  injury and damages.  This is so even under the Ninth Circuit's "totality of the circumstances" approach.  Plaintiff has not sufficiently proven that any of Defendant's advertisements are literally false.  Thus, even though actual consumer confusion need not be shown, Plaintiff still fails to prove its entitlement to damages because it has failed to prove the falsity of Defendant's advertisements.

Similarly, the Court cannot "presume" actual deception and reliance because Plaintiff has produced no evidence that Defendant's *deliberately* published *false* advertisements.  Any attempt by Plaintiff, for example, to prove that Defendant "intended" their ads to mean 50,000 "emerged" insects is, again, baseless without sufficient, scientifically reliable evidence disproving such a  contention.  And, as already stated, Defendant's lack of "due diligence" is insufficient.

Finally, the Court notes that to the extent Plaintiff premises any damages upon Tom Spalding's testimony that he should receive a dollar of profit for every dollar he expends, is entirely speculative and  wholly unsubstantiated.

1

B.    Plaintiff's Other Claims

2

(i)    Common Law Disparagement or "Trade Libel"

3    Under California law, "trade libel" is defined as "intentional disparagement of

4    quality of property, which results in pecuniary damage." *Aetna Cas. & Sur. Co. v.*

5    *Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988).  To prove trade libel, Plaintiff must

6    show "(1) a statement that (2) was false, (3) diparaging, (4) published to others in writing,

7    (5) induced others not to deal with it, and (6) caused special damages." *Atl. Mut. Ins. Co.*

8    *v. J. Lamb. Inc.*, 100 Cal.App.4th 1017, 1035 (Ct. App. 2002).  Because the Court is of the

9    opinion that no evidence of falsity has been sufficiently established, Plaintiff cannot prove

10    this claim.  However, Plaintiff will have an opportunity to address this further should it be

11    permitted to re-open its case-in-chief.

12

(ii)    Intentional Interference with Existing Economic Advantage[5]

13    To prevail, Plaintiff must prove "(1) a valid contract between plaintiff and a third

14    party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed

15    to induce a breach or disruption of the contractual relationship; (4) actual breach or

16    disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co.*

17    *v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (Cal. 1990).  As already discussed, Plaintiff

18    has not demonstrated any "intentional act."

19

(iii)    Intentional Interference with Prospective Economic Advantage

20    In order to prevail on a claim for intentional interference with prospective economic

21    advantage, a plaintiff must establish the following elements: (1) an economic relationship

22    between the plaintiff and third party containing the probability of future economic benefit

23    to the plaintiff, (2) knowledge by the defendant of the existence of the relationship,

24    (3)intentional acts on the part of the defendant designed to disrupt the relationship, (4)

25    actual disruption of the relationship, and (5) damages to the plaintiff proximately caused

26    by the acts of the defendant. *Reid-Ashman Mfg., Inc. v. Swanson Semiconductor Service,*

27

28

[5]    The Court addresses here Defendant's "induced breach of contract" arguments.

16

1  *LLC*, 2007 WL 1394427, *12 (N.D. Cal. 2007) (citation omitted).  In addition, "a plaintiff

2  seeking to recover for an alleged interference with prospective contractual or economic

3  relations must plead and prove as part of its case-in-chief that the defendant not only

4  knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was

5  wrongful by some legal measure other than the fact of the interference itself."  *Della Penna*

6  *v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393 (Cal. 1995).  California court have

7  held that "an act is independently wrongful if it is unlawful, that is, if it is proscribed by

8  some constitutional, statutory, regulatory, common law, or other determinable legal

9  standard."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1159 (Cal.

10  2003).  The Court has already discussed Plaintiff's failure to prove any unlawful conduct

11  on behalf of Defendant.  Further, as discussed above, Plaintiff has not shown the requisite

12  "intentional" act.  Accordingly, Defendant's Motion with respect to this claim will be

13  DENIED, subject to renewal once Plaintiff has satisfied the Court that it can offer evidence

14  sufficient to cure the deficiencies herein.

15              (iv)    Negligent Interference with Prospective Economic Advantage

16          Briefly, the Court notes that it is cognizant of the California Supreme Court's

17  decision in *J'aire Corp. v. Gregory*, 24 Cal.3d 799 (Cal. 1979).  That case established,

18  among other things, a six factor test to determine whether defendant owes plaintiff a duty

19  of care in a negligent interference cause of action.  However, as this district noted in *Sierra*

20  *Nat. Ins. Holdings, Inc. v. Altus Finance, S.A.*, 2001 WL 1343855, *17 (C.D. Cal. 2001),

21  because the parties are competitors and because they do not depend on the other's conduct

22  to carry on their own respective business, "a mechanical application and weighing of those

23  factors . . . would expand the theoretical scope of this tort far beyond its sensible

24  boundaries."  Accordingly, Plaintiff will be permitted to address any such deficiencies

25  related to this claim should it be permitted to re-open its case-in-chief.

26              (v)    Unfair Business Practices

27          The Court discusses here Defendant's Fed. R. Civ. P. 52(c) motion for judgment as

28  a matter of law with respect to Plaintiff's causes of action under Cal. Bus. & Prof. Code

17

1   Sections 17200, 17500, and 17505.  For the many reasons indicated above, Plaintiff's
2   evidence is insufficient to warrant permanent injunctive relief (Opp'n at 24).  Plaintiff, of
3   course, shall have the same opportunity to cure these deficiencies should it be permitted
4   to re-open its case.

6   IV.   <u>CONCLUSION</u>

7        For the foregoing reasons, the Court finds that, as a matter of law, Plaintiff cannot
8   prove any cause of action complained of.  Accordingly, judgment as a matter of law is
9   warranted. However, in light of the Court's obligations to provide Plaintiff an opportunity
10  to cure its evidentiary deficiencies Defendant's motion for judgment as a matter of law is
11  DENIED WITHOUT PREJUDICE.  Plaintiff is hereby ordered to make an oral proffer to
12  the Court of all evidence it contends will cure those deficiencies discussed herein.  Upon
13  conclusion of this proffer the Court will determine if Plaintiff is entitled to re-open its case-
14  in-chief, (referred to hereafter as its "case-in-chief extension").

15       If Plaintiff is permitted to re-open, it shall do so immediately following the close of
16  Defendant's case-in-chief.  Defendant shall have the right to renew its Rule 50(a) Motion,
17  including this Court's ruling thereon, upon the Court's rejection, if any, of Plaintiff's
18  proffer or at the conclusion of Plaintiff's case-in-chief extension, whichever is appropriate.

19       *Immediately after* the close of the Defendant's case-in-chief, Plaintiff may be
20  permitted to call any witness or witnesses to testify and to other introduce evidence *for the*
21  *limited purpose* of addressing the evidentiary deficiencies identified in the body of this
22  Order.

23       Plaintiff shall not be permitted nor shall Plaintiff attempt to introduce testimony or
24  other evidence that is not relevant to addressing the evidentiary deficiencies identified

herein,[6] and on objection by Defendant any such irrelevant testimony or other evidence shall not be received in evidence.  If Plaintiff is unprepared or unwilling to present its case-in-chief extension immediately after the close of Defendant's case-in-chief, Plaintiff's inability to do so shall be construed as a waiver of the opportunity to correct the above-noted deficiencies.  Plaintiff shall have one court day to complete the presentation of evidence during its case-in-chief extension, if any.

IT IS SO ORDERED.

DATED:      November 16, 2007

_____
OTIS D. WRIGHT II
UNITED STATES DISTRICT JUDGE

---

[6]   Obviously, then, Plaintiff should not construe this proffer as an opportunity to regurgitate evidence already discussed (and rejected) in its Opposition.

19